THE HONORABLE BENJAMIN H. SETTLE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JACOB KRAKAUER, individually and on behalf of all others similarly situated,

Plaintiff,

v.

RECREATIONAL EQUIPMENT, INC.,

Defendant.

Case No. 3:22-CV-05830-BHS

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Jacob Krakauer ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Recreational Equipment, Inc. ("REI" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

**NATURE OF ACTION**

1.      Plaintiff brings this class action lawsuit on behalf of himself and similarly situated consumers ("Class Members") who purchased Defendant's waterproof apparel (the "Products"),[1]

---

[1] The Products include REI Co-Op XeroDry GTX Jacket (Men's), REI Co-Op Westwinds GTX Jacket (Women's), REI Co-Op Drypoint GTX Jacket (Men's), REI Co-Op Rainwall Rain Jacket (Kids), and REI Co-Op Savanna Trails Pants (Men's), amongst other waterproof products. Discovery may demonstrate that additional REI products are within the scope of this Complaint. Plaintiff reserves the right to amend this Complaint to include additional apparel items identified through the course of discovery.

which are unfit for their intended use because they contain heightened levels of organic fluorine, which is itself indicative of unsafe per- and polyfluoroalkyl substances ("PFAS").  The Products, which are used for protection from rain and wind, are formulated, designed, manufactured, advertised, distributed, and sold by Defendant or its agents to consumers, including Plaintiff, across the United States.

2.      PFAS are a group of synthetic chemicals known to be harmful to both the environment and humans. PFAS can be released during the manufacture, use, and disposal of PFAS and PFAS-containing products.

3.      PFAS are readily absorbed into the body by various means, including by oral, dermal, and inhalation exposure. Because PFAS persist and accumulate over time, they are harmful even at very low levels. Indeed, PFAS have been shown to have numerous toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxic effects, and various cancers in epidemiology studies. The highest concentrations of PFAS are often found in the liver, kidneys, and blood.

4.      In fact, scientists are studying—and are extremely concerned about—how PFAS affect human health. Consequently, The Centers for Disease Control and Prevention ("CDC") outlined a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease.

5.      Scientists are also increasingly concerned about how PFAS affect the environment, as PFAS contaminate water, air, fish, and soil, and have been linked to harmful effects in animals as well.

6.      Consumers are becoming increasingly concerned with the negative harms proliferated by manufacturers regarding the materials used (including as to harmful chemicals affecting product safety), the treatment of workers (including as to workers' exposure to harmful working conditions), and the impact on the environment.

7.      Through its long-standing marketing campaigns, Defendant has targeted consumers like Plaintiff who seek premium brands that prioritize consumer well-being, workers' rights, and

environmental protection. There are competing brands that offer similar outdoor apparel products, but do not focus on capitalizing on these consumer preferences through their marketing.

8.      Defendant, an outdoor clothing apparel company, markets its products to consumers as "sustainable gear built to last," and "Fair Trade Certified™." Defendant states, "We put sustainability at the center of how we make products."  In addition, Defendant publicly states that it is "working toward a sustainable future" by developing "REI Product Sustainability Standards" and is "raising the bar on chemical use in important categories such as apparel."

9.      Defendant also represents to prospective consumers that "with every purchase you make with REI, you are choosing to steward the outdoors, support sustainable business and help the fight for life outside" and that REI is a member of the "Sustainable Apparel Coalition," which helps "retailers and manufacturers to measure their environmental and social impacts at each stage of the value chain."

10.      Finally, regarding the use of PFAS in its products, REI touts that it has "eliminated long-chain PFAS" from its waterproof REI Co-Op brand.

11.      Despite the above representations made by Defendant to consumers regarding the safety and sustainability of its products, research has shown that these claims are false and misleading. Independent research conducted by Toxic-Free Future, a nonprofit organization that conducts scientific studies, revealed that REI Co-Op Westwinds GTX Jacket (Women's), REI Co-Op Savanna Trails Pant (Men's), REI Co-Op Drypoint GTX Jacket (Men's), and REI Co-Op Rainwall Rain Jacket (Kids) all contain PFAS.

12.      In fact, the REI Co-Op Westwinds GTX Jacket (Women's), REI Co-Op Drypoint GTX Jacket (Men's), and the REI Co-Op Rainwall Rain Jacket (Kids) were <u>all found to contain long-chain PFAS</u>.

13.      Subsequent testing, commissioned by Plaintiff's counsel in September 2022 and conducted by Galbraith Laboratories revealed that Defendant's REI Co-Op XeroDry GTX Jacket (Men's) contains **48,577 parts per million (ppm) of organic fluorine**, a level that is more than 485 times the 100 ppm of organic fluorine that indicates intentional use of PFAS.

14.     In addition, testing commissioned by Plaintiff's counsel in June 2022 at Galbraith Laboratories also revealed that Defendant's REI Co-Op Rainwall Rain Jacket (Kids) contains **2,240 ppm of organic fluorine**.

15.     Organic fluorine results identify a quantity of organofluorine compounds (*e.g.*, PFAS) and exclude the possibility that fluorine may be present from other or natural sources.

16.     Finally, recent testing conducted by the Center for Environmental Health, a nonprofit organization that conducts testing on consumer products for toxic chemicals, found that REI's "waterproof rain jackets for kids and adults could expose individuals to perfluorooctanoic acid (PFOA) and perfluorooctane sulfonic acid (PFOS), **two of the most hazardous** and well-studied so-called 'forever chemicals,' or PFAS."

17.     Because several of the Products are waterproof jackets meant to resist rain, consumers frequently use the jackets' hoods, which rest directly against the skin, near the nose, mouth, and eyes. As a result, consumers are at a heightened risk of exposure to PFAS, including through ingestion, dermal absorption, and inhalation.

18.     For example, the images below show the marketing for the REI Co-Op XeroDry GTX Jacket for Men and the REI Co-Op Rainwall Rain Jacket for Kids.  Through normal use, the Products rest directly against the skin and near the nose, mouth, and eyes.

 

19.     Based on Defendant's representations, a reasonable consumer would expect that the Products can be safely used as marketed and sold. However, the Products are not safe, posing a significant health risk to unsuspecting consumers.

20.     Nor are the Products sustainable, as apparel produced with such high levels of organic fluorine is not responsibly sourced and is not compostable.  The forever chemicals contained in the Products will never break down, but rather persist and accumulate in the environment.

21.     Yet, neither before or at the time of purchase does Defendant notify consumers like Plaintiff that its Products are unsafe, contain heightened level of organic fluorine and certain named PFAS, or should otherwise be used with caution.

22.     Accordingly, Plaintiff brings his claims against Defendant individually and on behalf of a class of all others similarly situated for (1) violation of Washington's Consumer Protection Act § 19.86 *et seq*.; (2) breach of implied warranty; (3) breach of express warranty; (4) fraud; (5) constructive fraud; (6) fraudulent inducement; (7) money had and received; (8) fraudulent omission or concealment; (9) fraudulent misrepresentation; (10) negligent misrepresentation; (11) quasi-

contract / unjust enrichment; (12) negligent failure to warn; and (13) violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*

## PARTIES

23.     Plaintiff Jacob Krakauer is a natural person and a citizen of California who resides in Santa Clara, California. In approximately Spring 2020, Mr. Krakauer purchased Defendant's Product, an REI Co-op XeroDry GTX Jacket (Men's), from an REI store in Tacoma, Washington. Prior to his purchase, Plaintiff Krakauer reviewed the labeling, packaging, and marketing materials of his Product. Plaintiff Krakauer understood that based on Defendant's representations, the Products were safe for wear and otherwise sustainable. Plaintiff reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations and warranties were part of the basis of the bargain in that he would not have purchased the Products, or would not have purchased them on the same terms, if the true facts had been known. Plaintiff Krakauer's decision to purchase the Product was motivated by REI's reputation and in the belief that REI only sells Products that are safe and sustainable. As a direct result of Defendant's material misrepresentations and omissions, Mr. Krakauer suffered and continues to suffer, economic injuries. Namely, Mr. Krakauer would not have purchased Defendant's Products, or would have paid substantially less for them, had he known that the Products were not sustainable or safe, and instead coated in dangerous chemicals.

24.     Plaintiff Krakauer remains interested in purchasing waterproof products from Defendant that are safe for wear and otherwise sustainable. However, Plaintiff Krakauer is unable to determine if the Products are actually safe for wear and sustainable. Plaintiff understands that the composition of the Products may change over time. But as long as Defendant continues to represent itself and its Products are safe for wear and sustainable, then when presented with false or misleading information when shopping, he will be unable to make informed decisions about whether to purchase Defendant's Products and will be unable to evaluate the different prices between Defendant's Products and competitors' products. Plaintiff is further likely to be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to ensure that the Products marketed and labeled as safe for wear and sustainable, are, in fact, safe for wear and sustainable.

25.     Defendant Recreational Equipment, Inc. is a Washington corporation with its principal place of business located in Sumner, Washington. Defendant describes itself as a "local outdoor co-op, working to help you experience the transformational power of nature" and "with every purchase you make with REI, you are choosing to steward the outdoors, support sustainable business and help the fight for life outside."[2]

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A). There are more than 100 Class Members, the aggregate claims of all members of the proposed Class exceed $5,000,000.00, exclusive of interest and costs, and at least one Class Member is a citizen of a state different than Defendant.

27.     This Court has personal jurisdiction over Defendant because it transacts business in the United States, including in this District, has substantial aggregate contacts with the United States, including in this District, engaged in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, and purposely availed itself of the laws of the United States and the State of Washington, and further, because Plaintiff purchased the REI Co-Op XeroDry GTX Jacket (Men's) in this District.

28.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because this District is where a substantial part of the conduct giving rise to Plaintiff's claims occurred, where Defendant transacts business, and where Plaintiff Krakauer purchased the REI Co-Op XeroDry GTX Jacket (Men's).

29.     The practices described herein were conceived, reviewed, approved, and otherwise controlled from REI's nerve center, its headquarters in Sumner, Washington. Employees at REI's headquarters directed the production and assembly of the Products discussed herein. REI's breach of duty to Plaintiff arose from and emanated from Washington.

## FACTUAL ALLEGATIONS

### A.     PFAS in the Apparel Industry

---

[2] *Who we are*, REI, https://www.rei.com/about-rei (last accessed Jan. 27, 2023).

30.     PFAS are a category of chemicals that certain manufacturers use to enhance the performance of textiles and apparel.

31.     PFAS are often divided into two groups: long-chain and short-chain.

32.     Long-chain PFAS typically contain more than 6 carbons, and short-chain PFAS typically are described as those with less than 6 carbons.

33.     Long-chain PFAS are referred to as "older" PFAS because they were the first kinds of PFAS developed and used in consumer products. Long-chain PFAS have been banned in the European Union and phased out by major U.S. manufacturers, largely due to their health risks.

34.     According to the U.S. National Toxicology Program, research suggests that both long-chain and short-chain PFAS have similar levels of toxicity.

35.     PFAS chemical treatments are typically used on textiles in order to make them water repellant and/or stain resistant, waterproof, and breathable.

36.     As a result of the pernicious characteristics of PFAS, various apparel companies have announced the elimination of PFAS from their supply chains.

37.     However, certain companies in the outdoor industry like REI largely flout customer concerns about the environmental and public health impact of PFAS, despite REI's representations to the contrary. REI instead misleadingly abuses its marketing strategy centered on consumer, worker, and environmental wellness to convince consumers that they are purchasing Products that are safe and unlike other textiles that wreak harms from manufacturing to disposal.

38.     REI continues to use PFAS despite the fact that there are equally effective alternatives to PFAS that do not cause harm to individuals or the environment.

39.     Consumers who wear apparel coated with PFAS can be directly exposed to PFAS through numerous means. For example, children can chew on clothes coated in PFAS and ingest the chemicals. PFAS-coated clothing can shed PFAS, releasing PFAS into the wearer's environment, including by attaching to household dust.

40.     Moreover, PFAS from clothing can be absorbed by the skin.

41.     Similarly, those manufacturing the Products are exposed to PFAS in their working environment.

42.     In terms of the environmental consequences, PFAS from apparel enter water bodies during manufacturing, during laundering or dry cleaning, and from landfills or incineration.

43.     In fact, studies show that countries with high volumes of apparel manufacturing, including but not limited to China, Bangladesh, and Vietnam, have waterways highly contaminated with PFAS.

44.     Defendant manufactures its products across the world, including in factories in China, Vietnam, Taiwan, Indonesia, South Korea, Sri Lanka, El Salvador, Guatemala, and the United States.

45.     Here in the United States, PFAS from apparel deposited in landfills contaminate approximately 16 billion gallons of water leached from US landfills each year.

46.     REI's home state, Washington, estimates that 2,066 metric tons, or 4.5 million pounds of PFAS in treated textiles are disposed of in landfills in the state every year.

47.     In sum, according to Emily Reder, Senior Manager of Illegal Toxic Threats at the Center for Environmental Health: "[l]ike all PFAS chemicals, PFOA and PFOS are highly persistent in the environment and break down slowly over time, accumulating in people and wildlife, and causing long-lasting health effects as well as polluting our environment.  Given what we know about the negative health effects of PFAS, no company should be adding any PFAS chemicals into their products."

**B.      Defendant's Sustainability and PFAS Elimination Campaign**

48.     Seeking to address consumer concerns surrounding the use of PFAS in outdoor apparel, REI has placed sustainability at the forefront of its marketing campaign.

49.     On its website, which is peppered throughout with images of nature, REI claims that it has been "working to help you experience the transformational power of nature" since 1938.  REI further claims that "with every purchase you make with REI, you are choosing to steward the outdoors, support sustainable business and help the fight for life outside."

First Amended Class Action Complaint
Case No. 3:22-cv-05830-bhs

Bursor & Fisher, P.A.
1990 North California Blvd.
Walnut Creek, CA 94596

-9-

50.     These representations were why Plaintiff purchased his REI Products over competitors.

 

 

51.     REI further claims to offer environmentally-conscious consumers "sustainable gear built to last" through its "product sustainability standards" that "raise[] the bar on Product Sustainability."

52.     These representations were why Plaintiff purchased his REI Products over competitors.

# Raising the Bar on Product Sustainability

**REI STAFF  |  APRIL 9, 2018**

At REI, we're working toward a sustainable future, for the planet and communities around the globe.  We're excited to announce the release of the REI Product Sustainability Standards, which will help us raise the bar on product sustainability at REI and across the outdoor industry. It will also make it easier for our members to buy products that support their sustainability values.

53.     On its website, REI claims that it is a member of the "Sustainable Apparel Coalition," which helps "retailers and manufacturers to measure their environmental and social impacts at each stage of the value chain."

54.     These representations were why Plaintiff purchased his REI Products over competitors.

# What we offer

## Sustainable gear built to last.

We don't just love and sell high-quality outdoor gear and apparel. We also design and develop our own: REI Co-op and Co-op Cycles. Our teams get outside with members in the dirt, wind and rain to put our designs to the test. That way our products work for you and can be passed down a generation—or two.

We put sustainability at the center of how we make products. In 2018, we debuted comprehensive product sustainability standards that apply to every brand we sell. Working closely with our partners at home and abroad allows us to make a larger impact across the outdoor industry. From seeking better ways of making goods, to advancing fair trade manufacturing practices, to putting our profits to good use, we advocate for the places we all love and make it easier for customers to shop their values.

55.     Specifically, regarding the use of PFAS in its Products, REI touts that it has "eliminated long-chain PFAS" from its waterproof REI Co-op brand.  This was important to Plaintiff's decision to purchase the Product just as it is for other reasonable consumers.

- **Durable Water Repellents (DWR):** Concerns about the toxicity and environmental persistence of certain durable water repellents is driving a transition in the industry. REI has eliminated long-chain PFAS DWR treatments from the REI Co-op brand. We use short-chain PFAS treatments where viable alternatives do not yet exist, and we continue to expand the use of non-fluorinated options.

56.     REI also touts the Product as "made in a Fair Trade Certified™ factory."  This was important to Plaintiff's decision to purchase the Product just as it is for other reasonable consumers. For example, according to Fair Trade Certified, "U.S. Consumers increasingly know and trust Fair Trade Certified™."

57.     Specifically, Fair Trade Certified notes that "[c]onsumers say verified statements of a brand's impact builds trust" and "Fair Trade USA's rigorously maintained standards set the global benchmark for sustainable sourcing, strengthens brand trust, and builds consumer loyalty."

58.     Fair Trade Certified also notes that "[w]e are the most widely recognized fair trade seal in the United States."

59.     Fair Trade Certified focuses on "[s]afe working conditions" and "[e]nvironmental protection."  For example, Fair Trade Certified states that "[w]orking with Fair Trade USA® makes you a partner in . . . taking steps to protect the planet."

60.     The Organization states that "66% of consumers recognize the Fair Trade Certified Seal," that "78% of consumers put their trust in the Fair Trade Certified Seal," and that "1 in 3 consumers are more likely to buy a product that carries the Fair Trade Certified seal."

61.     As an example of the impact this has on REI's pricing of the Product, Fair Trade Certified claims that "55% of Millennials indicated they'll pay a premium for Fair Trade Certified products."

62.     Indeed, REI recognizes the importance of the seal, noting directly on its website that "[b]y considering the following sustainability attributes when you shop, you can make a positive impact on the planet."  REI then proceeds to list Fair Trade as one such attribute.

63.     REI also advertises another certifier: bluesign®. bluesign® is a certifier that claims to "unite[ ]the entire textile value chain to reduce impacts on people and planet." However, bluesign currently only restricts 140 of 9,000 known manufactured PFAS.  While bluesign has committed to phasing out all bluesign-approved PFAS, this will not occur until July 2023 at the earliest.

64.     REI highlights bluesign directly on the purchasing page for various Products such as the REI Co-Op Rainwall Rain Jacket (Kids); the "[p]roduct meets the bluesign® criteria, the world's leading system for managing the environmental and human-health impacts of textile manufacturing." "[B]luesign®-approved materials conserve resources and protect the health of the environment, workers and wearer (your kid!)."

65.     However, as described in the next section, Defendant's Products are not safe for use or sustainable, and pose a critical risk to the safety and health of consumers, workers, and the environment.

**C.**     **Defendant's Products Contain Harmful PFAS**

   **1.**     **Several Tests Demonstrate that Defendant's Products Contain Heightened Levels of Organic Fluorine and PFAS**

66.     Recognizing the concerns about the potential for PFAS in waterproof apparel, Toxic-Free Future, a nonprofit organization that conducts scientific studies on toxic chemicals, in conjunction with independent laboratories, tested 60 total items, including 20 different outdoor apparel items, for fluorine.

67.     As fluorine may indicate the presence of PFAS, Toxic-Free Future then commissioned PFAS testing of items with fluorine levels in excess of the 100 parts-per-million screening threshold as recognized by Cal. Health & Safety Code Div. 104, Pt. 3, Ch. 15 (regulation defining "[t]he presence of PFAS in a product or product component" as "at or above 100 parts per million, as measured in total organic fluorine.").

68.     Of the 60 total items tested for fluorine, 35 of the items contained fluorine at levels above 100 parts-per-million, a level widely recognized as indicating intentional use of PFAS.

69.     Of the 20 outdoor apparel items found to contain fluorine in excess of 100 parts-per-million, PFAS were detected in 15, including different types of REI Jackets and Pants (the Products at issue).

70.     Toxic-Free Future also found that three of the REI Jackets contained a mixture of long-chain and short-chain PFAS.   In other words, the REI Co-Op Westwinds GTX Jacket (Women's), REI Co-Op Drypoint GTX Jacket (Men's), and the REI Co-Op Rainwall Rain Jacket (Kids) were all found to contain long-chain PFAS despite Defendant's representations to the contrary.[3]

---

[3] This finding demonstrates the substantial similarity of the Products, as each Product contained PFAS-compounds, including long-chain PFAS, despite Defendant's representations to the contrary. The Products are each manufactured by REI and consist of waterproof or water-resistant fabric. Further, the Products are similarly marketed and sold, and the environmental representations at issue apply to each Product.

71.     While PFAS were found in all of the REI Jackets tested by Toxic-Free Future, REI's Co-op Westwinds GTX Jacket had the highest level of long-chain and short-chain PFAS, which combined for a total PFAS-level in excess of 1000 parts-per-million.

72.     Worse, as the following chart demonstrates, the level of PFAS compounds in REI's Products are significantly higher than competitors:[4]



73.     Toxic-Free Future further explained the significance of these findings, noting that "[i]n 2020, U.S. Food and Drug Administration (FDA) scientists reviewed the toxicity of 6:2 FTOH. They described evidence from laboratory studies that 6:2 FTOH exposure results in effects including kidney and liver degeneration; impacts on thymus and spleen, key immune system organs; developmental effects including decreased survival of young and reduced growth lactation; and indications of possible carcinogenicity."

74.     Toxic-Free Future also described the significance of 8:2 FTOH, stating that "[i]ts abundance indicates that many textile manufacturers have continued to rely on older PFAS banned in other countries and phased out by U.S. manufacturers. As a result, U.S. residents have continued exposure to 8:2 FTOH and its breakdown products, which include PFOA and PFNA. These compounds are well-established as toxic and bioaccumulative, with estimated half-lives in people of [2] to 10 years for PFOA and 2.5 to 4.3 years for PFNA. Potential toxic effects of PFOA include

---

[4]  Fluorotelomer alcohols (FTOHs), building blocks used to make PFAS-containing surface treatments known as side-chain fluorinated polymers.

harm to the immune system, increased cholesterol, and cancer; and for PFNA, they include increased cholesterol and decreased antibody response to vaccines."

75.    The following table also reveals the type of PFAS in REI's Products, generally categorized as "older PFAS detected," which are long-chain PFAS, and are denoted by a red circle and "newer PFAS detected" indicated by an orange triangle:

| | | |
|---|---|---|
| REI Co-op | Columbia Rainy Trails Fleece Lined Jacket, Girls' | ▲ |
| REI Co-op | Mammut Kento HS Hooded Jacket, Men's | |
| REI Co-op | Patagonia Torrentshell Jacket, Women's | ▲ |
| REI Co-op | REI Co-op Drypoint GTX Jacket, Men's | ⊙ ▲ |
| REI Co-op | REI Co-op Westwinds GTX Jacket, Women's | ⊙ ▲ |
| REI Co-op | REI Rainwall Jacket, Kids | ⊙ ▲ |
| REI Co-op | REI Co-op Sahara Convertible Pant, Women's | |
| REI Co-op | REI Co-op Savanna Trails Pant, Men's | ▲ |

76.    In addition, heightened levels of fluorine are indicative of PFAS.  Plaintiff, through counsel, commissioned further testing at Galbraith Laboratory in June and September 2022 and, again, found heightened levels of organic fluorine.

> **2.    Organic Fluorine Testing Represents a Scientifically Valid Method of Testing for PFAS**

77.    As noted by *Consumer Reports*, "test[ing] products for their total organic fluorine content . . . is the simplest way to assess a material's total PFAS content. That's because all PFAS contain organic fluorine, and there are few other sources of the compound."

78.    The Biodegradable Products Institute ("BPI") has adopted <u>100ppm as a threshold</u>. Likewise, the Supply Chain Solutions Center ("SPSC") notes that it "recommends that companies systematically screen [their products] using a total fluorine method and investigate levels over 100 [ppm], which indicates intentional use."

79.     SPSC notes that "[t]he total fluorine method measures all forms of PFAS in the fibers and does not identify individual PFAS. It is an effective screening tool to detect intentionally added PFAS, and results should prompt a discussion with the supplier[.]"

80.     The Cancer Free Economy Network supports this conclusion, stating that "there are few standardized PFAS test methods."  Accordingly, researchers may rely on "total fluorine tests [which] are indirect methods designed to measure a representative element indicative of PFAS."

81.     Rainer Lohmann, Director of University of Rhode Island's Lohmann Lab, supports these conclusions, stating that "[i]f a product is showing really high fluorine levels, companies really can't claim they didn't use PFAS."

82.     The 100 ppm of organofluorine standard is even endorsed by state regulators, *see supra* ¶ 67.

83.     Finally, at least one court has also determined that fluorine testing is an appropriate measure for testing the presence of PFAS.  *See GMO Free USA v. Cover Girl Cosmetics, et al.*, Case No. 2021 CA 004786 B (D.C. Sup. Ct. June 1, 2022) ("TFUSA plausibly alleges that the product contains PFAS based on its fluorine testing.").

84.     As mentioned earlier, testing conducted by Galbraith Laboratories revealed that Defendant's REI Co-Op XeroDry GTX Jacket (Men's) contains **48,577 parts per million (ppm) of organic fluorine**.

85.     In addition, testing also revealed that Defendant's substantially similar REI Co-Op Rainwall Rain Jacket (Kids') contains **2,240 ppm of organic fluorine**.

86.     Finally, recent testing conducted by the Center for Environmental Health, a nonprofit organization that conducts testing on consumer products for toxic chemicals, found that REI's "waterproof rain jackets for kids and adults could expose individuals to perfluorooctanoic acid (PFOA) and perfluorooctane sulfonic acid (PFOS), **two of the most hazardous** and well-studied so-called 'forever chemicals,' or PFAS."

87.     Thus, contrary to the express representations made on REI's website that it "has eliminated long-chain PFAS," the use of long-chain PFAS continues to be prevalent in its Co-Op line of Products.

88.     Defendant knew about the presence of PFAS, including long-chain PFAS, in its Co-Op line of Products. As a manufacturer and marketer of the Products, Defendant knows not only that it uses PFAS treatment on its apparel to make those Products waterproof, but it also knows which specific PFAS are used in the Products, including whether the PFAS used are long-chain PFAS and/or short-chain PFAS.

89.     Neither Plaintiff nor other reasonable consumers could readily ascertain that the Products contain harmful chemicals.  The Products do not contain a clear indication of any chemicals used in their design and manufacturing, such as a tag listing the chemicals used.

### 3.     PFAS in Defendant's Products Pose an Unnecessary Risk to Consumers and the Environment

90.     Defendant chose not to disclose the PFAS-content of its Products, and instead concealed this information from environmentally and health-conscious consumers, to increase revenues by the cost savings associated with the use of these chemicals.

91.     This has not been without consequences for consumers because as noted, PFAS are particularly problematic to human health and the environment because they resist degradation in the environment and can remain in the body for years after exposure.

92.     Scientists agree that "among the few PFAS that have been well studied, common or shared adverse effects have been observed."

93.     Indeed, "PFOA and PFOS are two of the most studied PFAS chemicals; exposure to PFOA and PFOS is associated with the development of liver and pancreatic cancer, thyroid problems, reduced immune function, vaccine efficacy, and harm to developing fetuses, among other negative health effects," according to Dr. Jimena Díaz Leiva, Science Director at the Center for Environmental Health.

94.     Other scientists have written that "[e]ven if some PFAS are considered of low health concern, there may be starting materials, breakdown products and/or other PFAS by-products of high concern released during their lifecylces (*e.g.*, in the case of certain fluoropolymers) or they may be of high climate / environmental concerns (*e.g.*, in the case of perfluoroalkanes and perfluoro-tert-amines)."

95.     These latter scientists stated that "despite their diversity, PFAS do share one common structural feature that make them highly problematic, namely the presence of perfluoroalkyl moieties, resulting in their shared resistance to environmental and metabolic degradation."

96.     The scientists explained that the "concerns regarding the high persistence of chemicals" include "[i]ncreasing concentrations [that] will result in increased exposures and therefore increased probabilities for known and unknown health effects, be it by individual PFAS and/or in a mixture with other substances."

97.     Unquestionably, the health effects associated with PFAS are well known. According to Erika Schreder, Director of Science at Toxic-Free Future, "laboratory-based and epidemiological research has linked PFAS exposure to a number of serious health concerns. Primary among them are cancer and effects on lipid metabolism, but they also include immune suppression, thyroid disease, and harm to reproduction."

98.     In laboratory animals, PFAS exposure leads to liver, developmental and immune toxicity, and cancer. The effects seen at the lowest exposure levels, identified by The Agency for Toxic Substances and Disease Registry (ATSDR), include changes to nervous system development, decreased survival of young, suppressed immune response, liver degeneration, and decreased fetal and birth weights.

99.     Accordingly to Dr. Lina S. Birnbaum, Scholar in Residence at Duke University, Scientist Emeritus and Former Director of the National Institute of Environmental Health Sciences (NIEH) and National Toxicology Program, "[t]hese toxic chemicals are linked to serious problems like cancer, liver damage, decreased fertility, and asthma . . . . PFAS can [also] weaken our immune system, making us more vulnerable to infectious diseases like COVID-19."

100.   Others support these conclusions. In a 2019 study, for example, the U.S. Department of Health and Human Services' National Toxicology Program found that PFAS have adverse effects on human organ systems, with the greatest impact seen in the liver and thyroid hormone.

101.   The following figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health:"



102.   Worryingly, researchers are concerned that dermal contact with PFAS poses the same health hazards as ingesting the compound in water or food and PFAS are not quickly excreted from the body like other hormone-disrupting chemicals.

103.   PFAS are also known to migrate during laundering, meaning that clothing items which are treated with PFAS spread those chemicals onto the other clothing and into waterways.

104.   In total, this research demonstrates that the risk of severe health complications arising from exposure to PFAS is both credible and substantial.

105.     As noted, the harmful risks also extend to the environment where, once introduced, they quickly spread around the globe through multiple pathways, as demonstrated by the figure below.



106.     Once introduced, PFAS cause many of the same problems for other animals as they do for humans, including harm to the immune system, kidney and liver function of several animals from dolphins to sea otters to polar bears, often making their way to dinner tables of people who did not even purchase the Product.

**D.     Defendant's Misrepresentations and Omissions Are Actionable**

107.     Plaintiff and the Class were injured by the full purchase price of the Products because the Products are worthless, as they are marketed as sustainable and safe despite having characteristics that detract from the safety and sustainability of the Products. Alternatively, Plaintiff and the Class were injured by paying more for the Products than they otherwise would have.

108.     Plaintiff and Class Members bargained for apparel items that are safe and sustainable and were deprived of the basis of their bargain when Defendant sold them products containing more

than 100 ppm of organic fluorine, indicating the presence of PFAS, which are dangerous substances with well-known health and environmental consequences.

109.    No reasonable consumer would expect that a product marketed as sustainable, safe, and not containing long-chain PFAS would in fact pose a risk to their health, safety, and wellbeing, or that it may contain dangerous levels of organic fluorine and PFAS, which are indisputably linked to harmful health effects in humans and the environment. Accordingly, Plaintiff and Class Members suffered economic injuries as a result of purchasing the Products.

110.    As the Products expose consumers to organic fluorine and PFAS that pose a risk to consumers' health, the Products are not fit for use by humans. Plaintiff and the Class are further entitled to damages for the injury sustained in being exposed to heightened levels of organic fluorine and toxic PFAS, damages related to Defendant's conduct, and injunctive relief.

111.    Moreover, because these facts relate to a critical safety-related deficiency in the Products, Defendant was under a continuous duty to disclose to Plaintiff and Class Members the true standard, quality, and grade of the Products and to disclose that the Products may contain substances known to have adverse health and environmental effects. Nonetheless, Defendant concealed and affirmatively misrepresented the Products, as discussed herein.

112.    Additionally, Defendant owed Plaintiff a duty to disclose because Defendant made misleading representations and omissions and failed to qualify its safety and environmental representations.  Further, Defendant had exclusive knowledge as to the true nature of the Products, including that the Products contained PFAS.  As Defendant oversees the design and manufacturing of the Products, it knew that the Products were treated with and contained PFAS, including long-chain PFAS.  In contrast, as previously noted, the existence of PFAS in the Products was not readily ascertainable to Plaintiff, nor to those similarly situated.

113.    Although Defendant is in the best position to know what content it placed on its website and in marketing materials during the relevant timeframe, and the knowledge that Defendant had regarding the presence of organic fluorine and PFAS and its failure to disclose the existence of

these in the Products to consumers, to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

114.   **WHO**:  Defendant made material misrepresentations and/or omissions of fact about the Products through labeling, website representations, and marketing statements, which include the representations that the Products are sustainable, safe, and free of long-chain PFAS. These representations also constitute omitted material information regarding harmful chemicals in the Products, including short-chain PFAS and long-chain PFAS.

115.   **WHAT**:  Defendant's conduct here was, and continues to be, fraudulent because it omitted and concealed that the Products contain substances—organic fluorine and PFAS—that are widely known to have significant health and environmental repercussions. Thus, Defendant's conduct deceived Plaintiff and Class Members into believing that the Products are safe and sustainable, when they are not. Defendant knew or should have known that this information is material to reasonable consumers, including Plaintiff and Class Members in making their purchasing decisions, yet Defendant continued to pervasively market the Products in this manner.

116.   **WHEN**:  Defendant made material misrepresentations and/or omissions during the putative Class periods, including prior to and at the time Plaintiff and Class Members purchased the Products, despite its knowledge that the Products contain harmful substances.

117.   **WHERE**:  Defendant's marketing message was uniform and pervasive, carried through material misrepresentations and/or omissions on the labeling of the Products' packaging, website, and through marketing materials.

118.   **HOW**:  Defendant made material misrepresentations and/or failed to disclose material facts regarding the Products, including the presence of heightened organic fluorine and PFAS.

119.   **WHY**:  Defendant made the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiff, Class Members, and all reasonable consumers to purchase and/or pay the requested price for the Products, the effect of which was that Defendant profited by selling the Products to tens of thousands of consumers.

120.    **INJURY**: Plaintiff and Class Members purchased, paid a premium, or otherwise paid more for the Products when they otherwise would not have absent Defendant's misrepresentations and/or omissions.

## TOLLING AND ESTOPPEL OF THE STATUTE OF LIMITATIONS

121.    Defendant would have had actual knowledge for years that the Products contain harmful chemicals such as heightened levels of organic fluorine and PFAS.

122.    Although Defendant was aware of the deception in its labeling given the inclusion of organic fluorine and PFAS in the Products despite claims of the Products' safety and sustainability, Defendant took no steps to warn Plaintiff or Class Members of risks related to organic fluorine and PFAS in the Products.

123.    Despite its knowledge, Defendant has fraudulently misrepresented the risks of the Products. Defendant had a duty to disclose the true nature and quality of the Products and to disclose the health and safety risks associated with the Products.

124.    Defendant made, and continues to make, affirmative misrepresentations to consumers to promote sales of the Products, including that the Products are safe and sustainable.

125.    Defendant concealed material facts that would have been important to Plaintiff and Class Members in deciding whether to purchase the Products. Defendant's concealment was knowingly committed, and it intended to, and did, deceive reasonable consumers, including Plaintiff and Class Members.

126.    The organic fluorine and PFAS included in the formulation, design, and/or manufacture of the Products were not reasonably detectible to Plaintiff and Class Members.

127.    At all times, Defendant actively and intentionally concealed the existence of the organic fluorine and PFAS and failed to inform Plaintiff or Class Members of this risk. Accordingly, Plaintiff and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

128.    Defendant's statements, words, and acts were made for the purpose of suppressing the truth that the Products contained harmful chemicals.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-05830-BHS

BURSOR & FISHER, P.A.
1990 NORTH CALIFORNIA BLVD.
WALNUT CREEK, CA 94596

1      129.   Defendant concealed or misrepresented this information for the purpose of delaying

2  Plaintiff and Class Members from filing a complaint on their causes of action.

3      130.   As a result of Defendant's active concealment of the organic fluorine and PFAS

4  and/or failure to inform Plaintiff and Class Members of the organic fluorine and PFAS, any and all

5  applicable statute of limitations otherwise applicable to the allegations herein have been tolled.

6  Furthermore, Defendant is estopped from relying on any statute of limitations in light of its active

7  concealment of the potentially harmful nature of the Products.

8      131.   Further, the causes of action alleged herein did not accrue until Plaintiff and Class

9  Members discovered that the Products contained organic fluorine and PFAS, which, at the very

10 earliest, would have been in January 2022. Plaintiff and Class Members had no realistic ability to

11 discern that the Product contained PFAS until after the Toxic-Free Future study. Plaintiff and Class

12 Members were hampered in their ability to discover their causes of action because of Defendant's

13 active concealment of the existence of organic fluorine and PFAS in the Products and of the Products'

14 true nature.

15 **CLASS ALLEGATIONS**

16     132.   Plaintiff brings this nationwide class action pursuant to 23(b)(2), 23(b)(3), and

17 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as all

18 persons in the United States who purchased the Product (the "Class"). Excluded from the Class are

19 persons who made such purchases for purposes of resale.

20     133.   Plaintiff also seeks to represent a subclass of all Class Members who purchased the

21 Products in the State of Washington (the "Washington Subclass"). Excluded from the Washington

22 Subclass are persons who made such purchases for purpose of resale.

23     134.   As a result of additional information obtained through further investigation and

24 discovery, the above-described Class and Subclass may be modified or narrowed as appropriate,

25 including through the use of multi-state subclasses.

26     135.   At this time, Plaintiff does not know the exact number of members of the

27 aforementioned Class and Subclass ("Class Members" or "Subclass Members"). However, given the

28

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-05830-BHS

BURSOR & FISHER, P.A.
1990 NORTH CALIFORNIA BLVD.
WALNUT CREEK, CA 94596

-24-

nature of the claims and the number of retail stores in the United States selling Defendant's Products, Plaintiff believes that Class and Subclass Members are so numerous that joinder of all members is impracticable.

136. There is a well-defined community of interest in the questions of law and facts involved in this case. Questions of law and fact common to members of the Class that predominate over questions that may affect individual Class Members include:

(a) whether Defendant misrepresented and/or failed to disclose material facts concerning the Products;

(b) whether Defendant's conduct was unfair and/or deceptive;

(c) whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the Class;

(d) whether Plaintiff and the Class sustained damages with respect to the common law claims asserted, and if so, the proper measure for their damages.

137. With respect to the Washington Subclass, additional questions of law and fact common to the members include whether Defendant violated the Washington Consumer Protection Act.

138. Plaintiff is an adequate representative of the Class and Washington Subclass because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of the Class Members will be fairly and adequately protected by Plaintiff and his counsel.

139. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and

factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

**COUNT I**

**(Violation of Washington's Consumer Protection Act,**
**Wash. Rev. Code §§ 19.86, *et seq.*)**

140.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

141.    Plaintiff brings this claim individually and on behalf of the Class and the Washington Subclass under the laws of the State of Washington.

142.    The Washington State Consumer Protection Act, RCW 19.86.020 (the "CPA") prohibits any "unfair or deceptive acts or practices" in the conduct of any trade or commerce as those terms are described by the CPA and relevant case law.

143.    REI is a "person" as described in RWC 19.86.010(1).

144.    REI engages in "trade" or commerce" as described in RWC 19.86.010(2) in that it engages in selling clothing products, including the rain jackets at issue, that directly and indirectly affect the people of the State of Washington.

145.    By virtue of the above-described wrongful actions, omissions, and want of ordinary care that directly and proximately caused the production of unsafe and unsustainable Products, Defendant engaged in unlawful, unfair, and fraudulent practices within the meaning, and in violation of the CPA, in that Defendant's practices were injurious to the public interest because they injured other persons, had the capacity to injure other persons, and/or have the capacity to injure other persons.

146.    In the course of conducting its business, Defendant committed "unfair or deceptive acts or practices" by, inter alia, employing false, misleading and deceptive representations (and corresponding omissions) about the nature of its Products, including that its Products are fit for

human use, safe, and sustainable.  These representations (and corresponding omissions) are deceptive in light of the inclusion of organic fluorine and PFAS in Defendant's Products. Accordingly, Plaintiff and Class Members were misled into believing that the Products are fit for human use, safe, and sustainable when they are not.

147.    The gravity of REI's wrongful conduct outweighs any alleged benefits attributable to such conduct.  There were reasonably available alternatives to further REI's legitimate business interests other than engaging in the above-described wrongful conduct.

148.    As a direct and proximate result of Defendant's false, misleading, and deceptive representations (and corresponding omissions), and its violations of the CPA, Plaintiff and Class Members were injured in that they would not have purchased the Products, or would have paid substantially less for them, but for Defendant's false and misleading representations (and corresponding omissions) concerning the nature of the Products as fit for human use, safe, and sustainable.

149.    Plaintiff, on behalf of himself and the Class Members also seek to recover actual damages sustained by each class member together with the costs of the suit, including reasonable attorney fees.  In addition, Plaintiff, on behalf of himself and the Class Members request that this Court use its discretion, pursuant to RCW 19.86.090, to increase the damages award for each Class Member by three times the actual damages sustained not to exceed $25,000.00 per class member.

## <u>COUNT II</u>
### (Breach of Implied Warranty of Merchantability, Wash. Rev. Code § 62A.2-314)

150.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

151.    Plaintiff brings this claim individually and on behalf of the Class under the laws of the state of Washington.

152.    Defendant's Products are goods as defined in Wash. Rev. Code § 62A.2-314.

153.    Plaintiff and the Class Members are buyers as defined in Wash. Rev. Code § 62A.2-103(1)(a).

154.    Defendant is a seller as defined in Wash. Rev. Code § 62A.2-103(1)(d).

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-CV-05830-BHS

BURSOR & FISHER, P.A.
1990 NORTH CALIFORNIA BLVD.
WALNUT CREEK, CA 94596

155.    Wash. Rev. Code § 62A.2-607 is satisfied because Plaintiff, through counsel, provided Defendant a reasonable opportunity to cure the defects contained in the Products by sending Defendant a cure notice outlining those defects in full via certified mail on September 16, 2022. The notice stated that it was sent "pursuant to U.C.C. § 2-607 concerning breaches of express and implied warranties" and was sent on behalf of "all similarly situated purchasers of REI waterproof apparel (collectively, the 'Products')" and that "discovery may demonstrate that additional REI products are within the scope of this Demand."  Defendant did not respond to that notice.

156.    Plaintiff's Counsel also filed a previous action titled *Lupia v. Recreational Equipment, Inc.*, Case No. 4:22-cv-02510-JSC (N.D. Cal. 2022). Therefore, Defendant was placed on notice of the conduct described herein.

157.    Thus, all purposes of pre-suit notice have been met.

158.    Wash. Rev. Code § 62A.2-314(1) creates an implied warranty of merchantability when a seller "is a merchant with respect to goods of that kind."

159.    Defendant is a merchant as defined in Wash. Rev. Code § 62A.2-104(1) because it deals in goods of that kind (*i.e.*, selling waterproof apparel) and holds itself out as having knowledge or skill peculiar to the practices or goods involved (*i.e.*, selling clothing apparel).

160.    For goods to be merchantable, they must be "fit for the ordinary purposes for which such goods are used." Wash. Rev. Code § 62A.2-314(2)(c).

161.    Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, impliedly warranted that the Products (i) would not contain elevated levels of organic fluorine or PFAS, and (ii) are safe for human use and are sustainable.

162.    Defendant breached the warranty implied in the contract for the sale of the defective Products because they could not pass without objection in the trade under the contract description, the Products were not of fair or average quality within the description, and the Products were unfit for their intended and ordinary use because the Products manufactured, distributed, and sold by

Defendant were defective in that they contained elevated levels of organic fluorine and PFAS, and as such are not safe for human use and are not sustainable.

163.   The Products were not altered by Plaintiff or Class Members.

164.   The Products were defective when they left the exclusive control of Defendant.

165.   Defendant knew that the Products would be purchased and used without additional testing.

166.   The Products were defectively manufactured and unfit for their intended purpose, and Plaintiff and members of the Class did not receive the goods as warranted.

167.   As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and Class members have been injured and harmed because: (a) they would not have purchased the Products on the same terms if they knew that the Products contained harmful levels of organic fluorine and PFAS rendering them unsafe for human use and not sustainable; and (b) the Products do not have the characteristics, uses, or benefits as promised by Defendant.

168.    As a direct and proximate result of Defendant's breach of its implied warranties, Plaintiff and the Class have been damaged in an amount to be proven at trial.


### COUNT III
### (Breach of Express Warranty of Merchantability, Wash. Rev. Code § 62A.2-313)

169.   Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

170.   Plaintiff brings this claim individually and on behalf of the Class against Defendant under the laws of the state of Washington.

171.   Defendant's Products are goods as defined in Wash. Rev. Code § 62A.2-105(1).

172.   Plaintiff and the Class Members are buyers as defined in Wash. Rev. Code § 62A.2-103(1)(d).

173.  Defendant is a seller as defined in Wash. Rev. Code § 62A.2-103(1)(d).

174.  Wash. Rev. Code § 62A.2-607 is satisfied because Plaintiff, through counsel, provided Defendant a reasonable opportunity to cure the defects contained in the Products by sending Defendant a cure notice outlining those defects in full via certified mail on September 16, 2022. The notice stated that it was sent "pursuant to U.C.C. § 2-607 concerning breaches of express and implied warranties" and was sent on behalf of "all similarly situated purchasers of REI waterproof apparel (collectively, the 'Products')" and that "discovery may demonstrate that additional REI products are within the scope of this Demand."  Defendant did not respond to that notice.

175.  Plaintiff's Counsel also filed a previous action titled *Lupia v. Recreational Equipment, Inc.*, Case No. 4:22-cv-02510-JSC (N.D. Cal. 2022). Therefore, Defendant was placed on notice of the conduct described herein.

176.  Thus, all purposes of pre-suit notice have been met.

177.  Wash. Rev. Code § 62A.2-313 provides a cause of action to buyers when sellers breach express warranties.

178.  Here, Defendant made the express warranties described above.

179.  Those statements became the basis of the bargain for Plaintiff and the Class because they are factual statements that a reasonable consumer would consider material when purchasing Defendant's Products.

180.  Defendant breached these express warranties by delivering Products that contain organic fluorine and PFAS that are known to be harmful to human health and that are not sustainable.

181.  In doing so, Defendant breached Wash. Rev. Code § 62A.2-313.

182.  As a direct and proximate result of Defendant's breach of its express warranties, Plaintiff and the Class have been damaged in an amount to be proven at trial.

## COUNT IV
### (Fraud)

183.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

184.     Plaintiff brings this claim individually and on behalf of the Class under the laws of the State of Washington.

185.     At the time Plaintiff and Class Members purchased the Products, Defendant did not disclose, but instead concealed the true nature of the Products and misrepresented the Products as safe and sustainable.

186.     Defendant affirmatively misrepresented the Products, giving the Products the appearance of a product that is indeed sustainable and safe for use.

187.     Defendant also knew that its omissions and misrepresentations regarding the Products were material, and that a reasonable consumer would rely upon Defendant's representations (and corresponding omissions) in making purchasing decisions.

188.     Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true nature of the Products.

189.     Plaintiff and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

190.     Plaintiff and Class Members had a right to rely upon Defendant's representations (and corresponding omissions) as Defendant maintained monopolistic control over knowledge of the true quality of the Product.

191.     Plaintiff and Class Members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

## COUNT V
### (Constructive Fraud)

192.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

193.     Plaintiff brings this claim individually and on behalf of the Class under the laws of the State of Washington.

194.     At the time Plaintiff and Class Members purchased the Products, Defendant did not disclose, but instead concealed and misrepresented, the Products as discussed herein.

195.     Defendant affirmatively misrepresented the Products, giving the Products the appearance of a product that is indeed safe for use and sustainable.

196.     Defendant also knew that its omissions and misrepresentations regarding the Products were material, and that a reasonable consumer would rely upon its representations (and corresponding omissions) in making purchasing decisions.

197.     Defendant had an obligation not to omit or misrepresent the Products because in addition to the fact that the Products pertained to matters of safety: (a) it was in the sole possession of such information; (b) it made partial representations regarding the quality of the Products; and (c) Plaintiff and class members relied upon Defendant to make full disclosures based upon the relationship between Plaintiff and Class Members, who relied on Defendant's representations and omissions, and were reasonable in doing so, with the full knowledge of Defendant that it did and would have been reasonable in doing so.

198.     Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true quality of the Products.

199.     Plaintiff and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

200.     Plaintiff and Class Members had a right to rely upon Defendant's representations (and corresponding omissions) as, in addition to the fact that the issue pertained to safety, Defendant maintained monopolistic control over knowledge of the true quality of the Products, and what information was available regarding the Products.

201.     Defendant breached its duty to Plaintiff and Class Members to make full disclosures of the safety of its Products.

202.    Plaintiff and Class Members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, and Defendant's breach of its duty, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial.

## COUNT VI
### (Fraudulent Inducement)

203.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

204.    Plaintiff brings this claim individually and on behalf of the Class under the laws of the State of Washington.

205.    Defendant did not disclose, but instead concealed and misrepresented, the Products as discussed herein.

206.    Defendant knew, or should have known, that the Products were falsely portrayed and that knowledge of the safety-related issues discussed throughout was withheld from the consumer public.

207.    Defendant also knew that its omissions and misrepresentations regarding the Products were material, and that a reasonable consumer would rely on Defendant's representations (and corresponding omissions) in making purchasing decisions.

208.    Plaintiff and Class Members did not know—nor could they have known through reasonable diligence—about the true quality of the Products.

209.    Plaintiff and Class Members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

210.    Plaintiff and Class Members had a right to rely on Defendant's representations (and corresponding omissions) as Defendant maintained a monopolistic control over the Products, and what information was available regarding the Products.

211.    Defendant intended to induce—and did, indeed, induce—Plaintiff and Class Members into purchasing the Products, at the requested price, based upon their affirmative representations and omissions.

212.    Plaintiff and Class Members sustained damages as a result of their reliance on Defendant's omission and misrepresentations, thus causing Plaintiff and Class Members to sustain actual losses and damages in a sum to be determined at trial.

## COUNT VII
### (Money Had and Received)

213.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

214.    Plaintiff brings this claim individually and on behalf of the Class under the laws of the State of Washington.

215.    As a result of the Plaintiff's and Class Members' purchase of the Products, Defendant obtained money for its own use and benefit, and as a result of its breaches of contract and breaches of the covenant of good faith and fair dealing implied in those agreements, became indebted to the Plaintiff and Class Members in an amount to be determined at trial.

216.    No part of any of the monies due and owing to Plaintiff and Class Members has been repaid, although Plaintiff and Class members demand repayment, leaving the balance due, owing, and unpaid in an amount to be determined at trial plus interest.

## COUNT VIII
### (Fraudulent Concealment or Omission)

217.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

218.    Plaintiff brings this claim individually and on behalf of the Class under the laws of the State of Washington.

219.    At all relevant times, Defendant was engaged in the business of designing, manufacturing, distributing, and selling the Products.

220.    Defendant, acting through its representatives or agents, delivered the Products to its own distributors and various other distribution channels.

221.    Defendant willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Products as discussed throughout.

222.   Rather than inform consumers of the truth regarding the Products, Defendant misrepresented the quality of the Products as discussed herein at the time of purchase.

223.   Defendant made these material misrepresentations to boost or maintain sales of the Products, and to falsely assure purchasers of the Products that Defendant is a reputable company and that its Products are safe for use and sustainable. The false representations were material to consumers because the representations played a significant role in the value of the Products purchased.

224.   Plaintiff and Class Members accepted the terms of use, which were silent on the true nature of the Products, as discussed throughout. Plaintiff and Class Members had no way of knowing that Defendant's misrepresentations as to the Products, and had no way of knowing that Defendant's misrepresentations were misleading.

225.   Although Defendant had a duty to ensure the accuracy of the information regarding the Product, it did not fulfill these duties.

226.   Defendant misrepresented material facts partly to pad and protect its profits, as it saw that profits and sales of the Products were essential for its continued growth and to maintain and grow its reputation as a premier designer and vendor of the Products. Such benefits came at the expense of Plaintiff and Class Members.

227.   Plaintiff and Class Members were unaware of these material misrepresentations, and they would not have acted as they did, had they known the truth. Plaintiff's and Class Members' actions were justified given Defendant's misrepresentations. Defendant was in the exclusive control of material facts, and such facts were not known to the public.

228.   Due to Defendant's misrepresentations, Plaintiff and Class Members sustained injury due to the purchase of the Products, which did not live up to their advertised representations. Plaintiff and Class Members are entitled to recover full refunds for the Products they purchased due to Defendant's misrepresentations.

229.   Defendant's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff's and Class Members' rights and well-being, and in

---

part to enrich itself at the expense of consumers. Defendant's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competing products. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

### COUNT IX
### (Fraudulent Misrepresentation)

230.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

231.    Plaintiff brings this claim individually and on behalf of the Class under the laws of the State of Washington.

232.    Defendant falsely represented to Plaintiff and the Class that the Products were safe for use and otherwise sustainable.

233.    Defendant intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiff and the Class to purchase the Products.

234.    Defendant knew or should have known that their representations about the Products were false in that the Products are not safe for use or sustainable as discussed throughout. Defendant knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiff and the Class.

235.    Plaintiff and the Class did in fact rely on these misrepresentations and purchased the Products to their detriment. Given the deceptive manner in which Defendant advertised, marketed, represented, and otherwise promoted the Products, Plaintiff and Class Members' reliance on Defendant's misrepresentations was justifiable.

236.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered actual damages in that they would not have purchased the Products at all, or would not have paid the requested price, had they known of the safety risks associated with the Products and that it does not conform to the Products' labels, packaging, advertising, and statements.

237.    Plaintiff and the Class seek actual damages, attorney's fees, costs, and other such relief the Court deems proper.

## COUNT X
### (Negligent Misrepresentation)

238.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

239.    Plaintiff brings this claim individually on behalf of the Class under the laws of the State of Washington.

240.    Defendant had a duty to Plaintiff and the Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, detailing, distribution, and sale of the Products.

241.    Defendant breached its duty to Plaintiff and Class Members by developing, testing, manufacturing, marketing, detailing, distributing, and selling the Product to Plaintiff and Class Members that did not have the qualities, characteristics, and suitability for use as advertised by Defendant and by failing to promptly remove the Products from the marketplace or take other appropriate remedial action.

242.    Defendant knew or should have known that the qualities and characteristics of the Products were not as advertised, marketed, detailed, or otherwise represented or suitable for their intended use and were not as warranted and represented by Defendant. Specifically, Defendant knew or should have known that the Products were not safe for use or sustainable.

243.    As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they would not have purchased the Products at all, or would not have paid the requested price, had they known that the Products were not safe for use and that the Products do not conform to the Products' labeling, packaging, advertising, and statements.

244.    Plaintiff and the Class seek actual damages, attorney's fees, costs, and any other just and proper relief available.

## COUNT XI
### (Quasi-Contract / Unjust Enrichment)

245.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

246.    Plaintiff brings this claim individually and on behalf of the Class under the laws of the State of Washington, or alternatively, under the laws of the place of purchase.

247.    To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

248.    Plaintiff and Class Members conferred benefits on Defendant by purchasing the Products.

249.    Defendant was unjustly enriched in retaining the revenues derived from Plaintiff and Class Members' purchases of the Products. Retention of those moneys under these circumstances is unjust and inequitable because Defendant failed to disclose that the Products were unfit for their intended purpose as it was unsafe for use. These omissions caused injuries to Plaintiff and Class Members because they would not have purchased the Products if the true facts were known.

250.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and Class Members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

## COUNT XII
### (Negligent Failure to Warn)

251.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

252.    Plaintiff brings this claim individually and on behalf of members of the Class under the laws of the State of Washington.

253.    At all relevant times, Defendant was responsible for designing, constructing, testing, manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling the Products. At all relevant times, it was reasonably foreseeable by Defendant that the use of the Products in their intended manner involved substantial risk of injury and was unreasonably dangerous to Plaintiff and Class Members as the ultimate users of the Products.

254.    At all relevant times, Defendant knew or had reason to know of the risk of injury and the resultant harm that the Products posed to Plaintiff and Class Members, as the defects existed at

the time of their design, construction, manufacture, inspection, distribution, labeling, marketing, advertising, and/or sale, as described herein.

255.    Defendant as the designer, manufacturer, tester, distributor, marketer, advertiser, and/or seller of the Products, had a duty to warn Plaintiff and the Class of all dangers associated with the intended use of the Products.

256.    At minimum, the duty arose for Defendant to warn consumers that use of the Products raised a risk of harm, could result in injury, and was unreasonably dangerous.

257.    Defendant was negligent and breached its duty of care by negligently failing to provide warnings to purchasers and users of the Products, including Plaintiff and Class Members, regarding the true nature of the Products, their risks, and their potential dangers.

258.    Defendant was negligent and breached its duty of care by concealing the risks of and failing to warn consumers that the Products contain chemicals known to cause adverse health effects in humans.

259.    Defendant knew, or through the exercise of reasonable care should have known, of the inherent defect and resulting dangers associated with using the Products as described herein, and knew that Plaintiff and Class Members could not reasonably be aware of those risks.  Defendant failed to exercise reasonable care in providing Plaintiff and the Class with adequate warnings.

260.    As a direct and proximate result of Defendant's failure to adequately warn consumers that the use of the Products, including their intended use, could cause and has caused injuries and other damages, Plaintiff and Class Members have suffered damages, as described herein.  Plaintiff also requests medical monitoring as a means to safeguard their health and mitigate any damages for future medical treatment.

## COUNT XIII
### (Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*)

261.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

262.    Plaintiff brings this claim individually and on behalf of the Class under the laws of Washington.

263.    15 U.S.C. § 2310(d) is satisfied because Plaintiff properly invokes jurisdiction under the Class Action Fairness Act ("CAFA").

264.    15 U.S.C. § 2310(e) is satisfied because Plaintiff, through counsel, provided Defendant with a reasonable opportunity to cure the defects contained in the Products by sending Defendant a cure notice outlining those defects in full via certified mail on September 16, 2022. The notice stated that it was sent "pursuant to U.C.C. § 2-607 concerning breaches of express and implied warranties" and was sent on behalf of "all similarly situated purchasers of REI waterproof apparel (collectively, the 'Products')" and that "discovery may demonstrate that additional REI products are within the scope of this Demand."  Defendant did not respond to that notice.

265.    Plaintiff's Counsel also filed a previous action titled *Lupia v. Recreational Equipment, Inc.*, Case No. 4:22-cv-02510-JSC (N.D. Cal. 2022). Therefore, Defendant was placed on notice of the conduct described herein.

266.    Thus, all purposes of pre-suit notice have been met.

267.    15 U.S.C. § 2310(d)(1) provides a cause of action to "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation . . . under a written warranty, implied warranty, or service contract."

268.    Defendant's Products are consumer products as defined in 15 U.S.C. § 2301(1).

269.    Plaintiff and Class Members are consumers as defined in 15 U.S.C. § 2301(3).

270.    Defendant is a supplier and warrantor as defined in 15 U.S.C. §§ 2301(4) and (5).

271.    In connection with the marketing and sale of the Products, Defendant impliedly warranted that the Products are fit for human use and are sustainable. However, as described throughout, neither is true.

272.    By reason of Defendant's breach of warranties, Defendant violated the statutory rights due to Plaintiff and the Class pursuant to Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301 *et seq.*, thereby damaging Plaintiff and Class Members.

273.    Plaintiff and the Class Members were injured as a direct and proximate result of Defendant's breach because they would not have purchased the Products if they knew the truth about the Products.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

A.    For an order certifying the Class under Fed. R. Civ. P. 23 and naming Plaintiff Krakauer as representative of the Class and the Washington Subclass, and Plaintiff's attorneys as Class Counsel;

B.    For an order declaring that Defendant's conduct violates the statutes referenced herein;

C.    For an order finding in favor of Plaintiff, the nationwide Class, and the Washington Subclass on all counts asserted herein;

D.    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.    For prejudgment interest on all amounts awarded;

F.    For an order of restitution and all other forms of equitable monetary relief;

G.    For injunctive relief as pleaded or as the Court may deem proper;

H.    For medical monitoring as a means to safeguard Plaintiff and Class Members' health and to mitigate any damages for future medical treatment; and

I.    For an order awarding Plaintiff and the Class and Washington Subclass their reasonable attorneys' fees and expenses and costs of suit.

### DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:  January 27, 2023

Respectfully submitted,

**CARSON & NOEL, PLLC**

By: _____*/s/ Wright A. Noel*_____
        Wright A. Noel

20 Sixth Avenue, NE
Issaquah, Washington, 98027
Telephone: (425) 395-7786
Facsimile: (425) 837-5396
Email: wright@carsonnoel.com

**BURSOR & FISHER, P.A.**

L. Timothy Fisher (*pro hac vice*)
Sean L. Litteral (*pro hac vice*)
Elvia M. Lopez (*pro hac vice*)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
Email:  ltfisher@bursor.com
            slitteral@bursor.com
            elopez@bursor.com

**BURSOR & FISHER, P.A.**

Jonathan L. Wolloch (*pro hac vice*)
701 Brickell Ave., Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: jwolloch@bursor.com

**RICHMAN LAW & POLICY**

Kim E. Richman (*pro hac vice*)
1 Bridge St., Suite 83
Irvington, NY 10533
Telephone: (914) 693-2018
krichman@richmanlawpolicy.com

*Attorneys for Plaintiff*

---

First Amended Class Action Complaint
Case No. 3:22-cv-05830-bhs

Bursor & Fisher, P.A.
1990 North California Blvd.
Walnut Creek, CA 94596

-42-